[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings:
The petitioners, John and Dorothy Budnick, seek to terminate the parental rights of Christopher and Denise Boronkay to their minor son, Joshua Boronkay, who was born September 11, 1982. The petition was originally filed with the New Fairfield Probate Court on October 25, 1988, and then transferred to this court pursuant to section 45a-715(g) of the Connecticut General Statutes. The petition was amended in this court on September 11, 1989 and alleged four grounds CT Page 10568 for termination.
 1. The child has been abandoned by the respondents in the sense that the respondents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
 2. The respondents were found in a prior proceeding to have neglected the child and have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondents could assume a responsible position in the life of the child.
 3. The child has been denied, by reason of act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being.
 4. There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the respondents having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child.
At trial, the petitioners' attorney withdrew the second ground because the child had never been adjudicated neglected or uncared for in a prior proceeding in this court.
The petitioners must prove at least one of the three grounds by clear and convincing evidence, which has existed for at least one year, unless waived by the court under section 45a-717(g).
The respondent father was represented by counsel at the trial held on October 8 and October 22, 1991. The respondent mother failed to appear, but the court found that notice of the proceedings were published in the Ansonia Sentinel, her last known address, pursuant to section 45a-716(c) of the Connecticut General Statutes. The court CT Page 10569 also canvassed the petitioners, her parents, and both stated for the record that they had not seen or heard from their daughter since April of 1989, and that her whereabouts are unknown to them. Based on the publication of notice, and the canvass of her parents, the court finds it had jurisdiction and enters a default.
At the trial, the court received testimony from the petitioners: Elaine Debet-Fricke, a DCYS social worker; Dr. Robert S. Colen, Ph.D., a licensed psychologist; and Christopher Boronkay, the father. The mandated social study was prepared by Ms. Debet-Fricke on June 23, 1989, and was entered into evidence. (Petitioners' Exhibit A.) Dr. Colen's psychological evaluation of the petitioners, the child, and the father, dated April 21, 1990, was also entered in evidence without objection. (See Petitioners' Exhibit B.) The mother also failed to appear for this evaluation. Although this evaluation was done after the amended petition was filed, the substance of it is relevant to the adjudicatory issues.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . ." Section 17a-93(e) of the Connecticut General Statutes. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 436 A.2d 290 (1980). "`Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children' undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous),177 Conn. 648, 671, 420 A.2d 875 (1979). The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17a-112(b) of the Connecticut General Statutes. In re Juvenile Appeal (84-BC), 194 Conn. 252,255; In re Theresa S., 196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83 BC), 189 Conn. 66, 72; In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708, cert. denied,195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 745,747-48. Section 1049 of the Connecticut Practice Book states: "The allegations of an application to terminate parental rights shall be proved by clear and convincing evidence." Clear and convincing evidence has been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. CT Page 10570 Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondents' rights as a parent should be ended. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase takes into account the best interests of the child, and the court is permitted to take into consideration events which had occurred after the filing of the petition to the time of trial.
Some of the background facts that are not in dispute should shed some light on this case. The child, Joshua, was born to the respondent parents, Christopher and Denise Boronkay, on September 8, 1982. In the first year after he was born, they moved at least three times. About a year later, she suddenly moved out without the child. In April, 1984 she filed for a divorce, and in November, 1984 it was granted in the Danbury Superior Court. During this tumultuous time, the father and Joshua moved into the home of his parents, Victor and Josephine Boronkay, who were retired and living in New Fairfield. Joshua lived with these parental grandparents from June, 1984 to January, 1986, or about eighteen months. On January 10, 1986, the father took Joshua to the home of his maternal grandparents, the petitioners, John and Denise Budnick, where he thought his former wife was residing. Instead, she had left their home for parts unknown. He told the Budnicks that his mother had a heart attack and stroke and that his parents could no longer care for him. The father did not return for the child, which caused the Budnicks to contact the Department of Children and Youth Services (hereinafter referred to as "DCYS") in Danbury as to what they should do. They were advised that unless the parents or some suitable and worthy CT Page 10571 person would accept responsibility for the child's care, the child could be placed in foster care. They did not want their grandson to become a ward of the state and therefore filed an application to be appointed guardians on January 31, 1986 with the Probate Court of New Fairfield. A hearing on that application was held by Probate Judge Larkin, and notice was given to all interested parties. Those in attendance were the respondent parents, the petitioners, the Budnicks and the paternal grandparents, the Boronkays. The parents agreed to being removed as guardians, and they signed a written consent to the petition after having their rights explained by Judge Larkin. He also explained to the Boronkays that they could have filed for guardianship of Joshua. They explained that Mrs. Boronkay's stroke and other circumstances would not allow them to take the child. At that time, the Budnicks were both working full-time and both were fifty-seven years old. In order to accept the guardianship, Mrs. Budnick resigned and left her job to stay home to care for Joshua. The Probate Court decree dated April 11, 1986 appointed the Budnicks co-guardians of Joshua (see Respondents' Exhibit 1), giving reasonable rights of visitation to the paternal grandparents, the Boronkays, and to the respondent parents, Christopher and Denise Budnick. The decree also found that the minor child has been denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as a result of acts of parental acts of commission or omission.
On October 25, 1988, the Budnicks filed a petition to terminate the parental rights of the respondent parents with the New Fairfield Probate Court which was transferred to this court and amended on September 11, 1989.
Adjudicatory Phase:
The court will consider the relevant and material evidence from January 10, 1986 when the child was left with the petitioners to September 11, 1989, the date the petition was amended, and make findings of fact during this period. Further findings of fact will be made in the dispositive phase from September 11, 1989 to the time of trial on October 8, 1991.
The first ground alleged for termination was abandonment. This statutory section 45a-717(f)(1) of the Connecticut General Statutes is met if a parent fails to maintain a "reasonable degree of interest, concern or responsibility as to the welfare of the child" and prove this ground by clear and convincing evidence. What is reasonable is a question of fact for this court to determine. In re CT Page 10572 Luis C., 210 Conn. 157 (1989). The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently had to be established. See, e.g., Litvaitis v. Litvaitis, 162 Conn. 540,547 (1972); Kantor v. Bloom, 90 Conn. 210, 213 (1916).
The Appellate Court in In re Rayna M., 13 Conn. App. 23,36-37 (1987) related statutory abandonment to a deficiency in performance of the parental obligations set forth in an earlier decision of the Supreme Court. In In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 15 (1981). The Supreme Court stated that the commonly understood obligation of parenthood encompassed the following minimum attributes: (1) expressions by the parent of love and affection for the child; (2) expressions of personal concern by the parent as to the health, education and general well-being of the child; (3) a duty on the part of the parent to supply the necessary food, clothing and medical care; (4) a duty on the part of the parent to provide an adequate domicile; and (5) a duty on the part of the parent to furnish social and religious guidance.
The extent to which a specific parent should be held to the performance of all or some of the obligations must, of necessity, depend upon the particulars of a given case. In characterizing statutory abandonment, the Supreme Court has emphasized that the focus is on the parents' conduct and that the question is one of fact to be resolved by the trial court in the light of relevant circumstances. In re Juvenile Appeal (Docket No. 9489), supra, 14.
The verb "maintain" as used in section 45a-717(f)(1) of the Connecticut General Statutes contemplates that the parent will continue to have a reasonable degree of concern, interest and responsibility in the welfare of his children. In re Migdalia M., 6 Conn. App. 194, 210. Where the parent lives apart from the child, indicia of such concern, interest or responsibility can be shown by provisions for support and the maintenance of conduct through visits and telephone calls and by sending cards or gifts. In re Luke G., 40 Conn. Sup. 316,323 (1986).
From the testimony of the petitioners and Ms. Debet-Fricke, the DCYS social worker, the court finds that Joshua has lived in the Budnicks' home from January 10, 1986 to the present, or for almost six years. The respondent mother had been living with the Budnicks from May, 1985 recovering from a back operation, and in December she left their home without explanation. She did attend the hearing in the New Fairfield Probate Court in April, 1986 when she CT Page 10573 and the respondent father consented to having the Budnicks appointed guardians of their child. She did visit him at Christmas, 1986, but then did not see Joshua again until April, 1989 when she came unannounced with a two year old daughter to visit them. During this twenty-eight month absence, she never acknowledged his birthday or holidays such as Christmas and Easter with gifts or cards. In effect, she had gone out of his life completely during this period which continued to September 11, 1989, the date this petition was amended. She left it all to her parents to provide her son with a home, food, clothing, medical care, religious or educational training. She has failed to meet any of the five minimum obligations required of a parent as outlined in In re Rayna M., supra. Instead, she left all of them for these petitioners to fulfill for her.
The respondent father left his son with the petitioners on January 10, 1986, consented to the Budnicks being appointed co-guardians on April 11, 1986. Shortly thereafter, he moved into his girl friend's apartment in Danbury where he lived until November, 1989. (See Petitioners' Exhibit A — social study prepared by Ms. Debet-Fricke.) From January, 1986, to when the termination petition was filed in the New Fairfield Probate Court on October 25, 1988, he called the Budnicks twice about his son. The reason he gave Ms. Debet-Fricke for his disinterest was that he did not get along with them. His parents, the Boronkays, would have Joshua visit them two weekends a month, and the respondent claims he visited Joshua there at least once a month. He testified that on these occasions he played games with him, helped with his school work, and took him fishing. He claimed that he offered financial support to the Budnicks, which they refused. In his testimony, and in the social study, he expressed love for his son and a desire to be reunited with him in the future. He has bought him gifts on his birthday and at Christmas. But he admitted having no contact whatsoever with the child for at least eight months after moving to his girl friend's apartment and admitted it was "the biggest mistake of my life." His statement that he loves Joshua and that they both enjoyed their monthly visits at his parents' home, falls far short of meeting the five minimum obligations of parenthood. And to say that he offered to provide financial support is not the test, but what he did in fact provide. The court must primarily consider his conduct and actions and not his words. The court finds that from January, 1986 to the present, almost six years, he provided no financial support whatsoever. The petitioners provided and paid for all of the child's food, clothing and medical care. The respondent father has never provided a home for his son during this period and his CT Page 10574 employment has been sporadic. At the beginning, the petitioners paid $500.00 per month for day care and tuition of $1,000.00 per year and transportation to attend private school in Wilton. In his testimony, the father admitted not knowing the child's doctor or his teachers nor did he attend school conferences. He admitted not providing religious training and did not inquire regarding it. The court finds that the petitioners and not the respondent father provided and met all of the obligations required of a parent under this statutory ground and the case law. In re Rayna M., supra. After considering all of the evidence, the court finds that the petitioners have proved statutory abandonment of this child by both respondent parents by clear and convincing evidence. In fact, the evidence was overwhelming.
The second statutory ground alleged for termination was that by parental acts of commission or omission, this child has been denied the care, custody, or control necessary for his physical, educational, moral, or emotional well-being. Section 45a-717(f)(2) of the Connecticut General Statutes. The same evidence that proved the ground of abandonment can establish other grounds alleged in a petition. In re Shannon S., 19 Conn. App. 20 (1989). The same acts of parental omission proved on the first ground would apply to the four requirements here that the child has been denied the care, custody or control for his physical, educational, moral and emotional well-being. The court finds that the evidence has been clear and convincing to prove the second ground. The respondents failed to meet the necessary criteria, and they again left all their obligations to the petitioners to fulfill for them.
The third and last ground was that there is no ongoing parent-child relationship, section 45a-717(f)(3) of the Connecticut General Statutes, which has two tests that the court must consider. First, that there is the absence of a relationship "that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child. . . ." And second, that "to allow further time for the establishment . . . of the parent child relationship would be detrimental to the best interests of the child."
The respondent mother has withdrawn totally from the child's life for the adjudicatory time period and, in fact, to the time of trial, which is about six years. There was no evidence to determine where she is now living, or ifs he will ever return to see her child. The evidence is clear and convincing that there is no present parent-child relationship as to this mother and to allow further time for it to develop CT Page 10575 would be detrimental to the child's best interests.
The evidence as to the father may at first seem ambivalent, but the court must consider for adjudication the facts to September 11, 1989. The facts after that date are to be considered in the disposition. The first test is met when a child has never known his parents, which is not the case here, or if a relationship had existed, it has been displaced. The proof of a displaced relationship depends on whether the child has specific memories and positive feelings for a natural parent. In re James T., 9 Conn. App. 608
(1987). The existence of such positive feelings depend upon the viewpoint of the child. In re Rayna M., supra. In the mandated social study prepared by DCYS social worker, Ms. Debet-Fricke, dated June 23, 1989 (Petitioners' Exhibit A), she concludes that the child does not appear to have a positive parental relationship and wishes to continue living with the petitioners. She states that the child wishes to continue visiting his parental grandparents, the Boronkays, and would like to see his biological parents.
The testimony of clinical experts is entitled to great weight in termination. In re Nicolina T., 9 Conn. App. 598,607 (1987). The interaction psychological study by Robert S. Colen, Ph.D., dated April 21, 1991, involved three interviews with the petitioners and five with the child and the respondent father. He concluded that the child is strongly bonded to the petitioners who are now his psychological parents. He has a strong desire to remain with them as clearly this is his home. He testified that it was to the child's best interests to remain there and described his relationship with the father as both minimal and marginal.
Dr. Colen also reported that the child always had a positive and good relationship with the paternal grandparents, and his visitations of one weekend per month and one afternoon during the week should be continued. There is no doubt that these grandparents afford him additional love and security. His report states that the child has feelings of ambivalence and confusion towards his father caused by his being abandoned for over two years. But after the termination petition was filed in October, 1988, he began seeing him regularly at his parents' home. On July 17, 1989, after a hearing on visitation held in Danbury Superior Court (Sullivan, J.), he was allowed contemporaneous visitation under the supervision of his parents. During these visitations, a more positive relationship developed between them. The father expressed love for Joshua and enjoyed playing games and sports and listening to music and going CT Page 10576 fishing with him. Based on this evidence, and by consent of all parties, the court approved a motion by the parties to increase his visitation to one additional weekend per month, without supervision, which will be part of the record and incorporated in any judgment on this case. But the father's improvement in visiting his son, and the enjoyment he had playing with him, falls far short of the statutory requirement that develops from a parent "meeting on a daily basis the physical, emotional, moral and educational needs of the child . . . ." These daily needs have been met entirely by the petitioners. To allow this parent more time would not be in the child's best interests. He has waited more than three years and nine months for the father to provide for his needs without success. Time has run out on him. The child is now nine years old, is a third grade student in New Fairfield Elementary School, obtaining excellent grades, and engages in numerous sports and has many friends there. He has not lived with his respondent father for over six years. The court finds from Dr. Colen's evaluation (Petitioners' Exhibit B), and from the other testimonial evidence, that this third ground of no ongoing parent-child relationship has been proved by clear and convincing evidence.
The findings that the petitioners have proved all of the three grounds of the petition by clear and convincing evidence is not enough to warrant granting the termination of parental rights. Connecticut Practice Book, Sec. 1049. The court must also find again by clear and convincing evidence that it is in the best interests of the child, after the court considers the six factors set forth in section 45a-717(h) of the Connecticut General Statutes.
1. The respondent parents left the child with the petitioners in January, 1986, and then consented to relinquishing guardianship to them. They would have welcomed either parent to reform their lives to regain guardianship and never prevented either of them in any way toward that end. Instead, neither parent provided any financial support for the child since January, 1986 to the present time. The petitioners have paid all costs for food, clothing, maintenance and education for the past six years.
2. The New Fairfield Probate Court decree granted the respondent parents reasonable visitation when it appointed the petitioners co-guardians on April 11, 1986. The respondent father's visitations were sporadic at best for the next three years and the mother visited him once.
After supervised visitation at his parents' home, pursuant to a Superior Court order (Sullivan, J.) on July 17, CT Page 10577 1989, the respondent father visited his son regularly.
3. According to Dr. Robert S. Colen's psychological evaluation dated April 21, 1990 (Petitioner's Exhibit B), the child, who was seven and one-half years old at that time, is strongly bonded to the petitioners and views them as his psychological parents and looks to them for support and love. He wants to remain with them in their home. He would like to continue seeing his father according to the plan ordered by Judge Sullivan on July 17, 1989. The respondent mother has lost contact with the child, seeing him twice during the past six years and, at best, Joshua has minimal emotional ties to her. The maternal grandparents have provided for all of this child's physical, educational, moral and emotional needs. He considers them as his parents after being in their home for the past six years.
4. Joshua was born on September 8, 1982, and is now nine years and two months old.
5. Both parents have been unable and unwilling to adjust their circumstances, conduct, and conditions to have the child returned to them in the foreseeable future. They both have had since April 11, 1986 to reform their lives and reapply for guardianship, but have failed to do so. The father has not obtained his own housing, steady employment or provided any financial support during these past six years. The mother has shown no interest in the child whatsoever during this same period. Time has run out for either of these parents to reform their lives.
6. The respondent parents themselves consented to relinquishing guardianship to the petitioners. No person or agency prevented them from developing or maintaining a relationship with the child. In fact, the petitioners encouraged them to resume their parental responsibilities, but they, by their own volition and acts of omissions, failed to accept the obligations of parenting for almost six years. Economic circumstances did not prevent him from maintaining a meaningful relationship. The father claimed he was unable to find work, but testified he paid his parents $100.00 per week room and board from unemployment benefits, and he never gave nor saved any money for his son. The court was unpersuaded that economic conditions prevented him from finding work or giving some benefits in order to provide some support for his son. He chose to give nothing.
After considering the above six factors, the evidence is clear and convincing that termination of the respondents' parental rights is in the best interests of this child. He CT Page 10578 deserves the care, nurturing, and security that the petitioners have provided him for the past six years. They are ready, willing and able to adopt him as soon as possible. Disposition:
As previously stated, the court can consider the evidence from September 11, 1989, the date the petition was amended, to the end of the trial on October 22, 1991. On October 22, 1991, the father testified that he is now thirty-one years of age, is employed earning between $300.00 to $500.00 a week, has savings of $4,000.00 and has left his girl friend and is living with his parents. By the end of this year, or in two months, he believes that he will be able to provide the housing and financial support to meet all of his son's daily needs, or do what he has been totally unable or unwilling to do for the past six years. The court is unpersuaded by his testimony when the facts have been to the contrary. The time has long passed for this child to be kept in limbo by the respondent parents. To remove him from the only home he has known for the past six years would be clearly detrimental to this child's best interests. The mandated social study dated June 23, 1989, prepared by DCYS social worker Ms. Debet-Fricke (Petitioners' Exhibit A), stated that for three years the biological parents had not fulfilled their parental roles. At this time, it is almost six years. Her study states that the child is well adjusted and healthy, has thrived in the Budnicks' home and Joshua told her then that he wants to live in their home.
The eleven page psychological evaluation prepared on April 21, 1990 by Robert S. Colen, Ph. D., a licensed psychologist, is even more persuasive that termination is in the child's best interests. (See Petitioners' Exhibit B.) He interviewed the petitioners and the child on five occasions and the respondent father three times. The Budnicks feel that the child is like their "second son" and he is happy and flourishing in their home and wish to adopt him to make more definitive plans for his future. The petitioners are now both sixty-two years old and are totally committed to his future welfare. They are both in excellent physical health and are stable mentally. Their marriage has been a happy one and they enjoy economic security. They want to adopt him as soon as possible. The child portrayed his life with them as all positive and they have encouraged and helped him attain good grades in school, participated in his sports and other activities, and have enjoyed taking care of all his needs on a daily basis. In his conclusion, Dr. Colen stated that this nine year old child is receiving excellent parenting from the Budnicks and is strongly bonded to them. He views them as his psychological parents and looks to them CT Page 10579 for support and love. The child strongly indicated his desire to remain with them as clearly this is his home. He expressed the desire to continue seeing his parental grandparents and his father, which the court has provided by accepting the motion for increased visitation as previously stated in this decision. Dr. Colen testified that his relationship with his father was both minimal and marginal, and has only minimal ties to his mother. The expert testimony of psychologists is entitled to great weight in termination proceedings. In re Nicolina T., supra, 605.
After considering all of the facts, the evidence is clear and convincing that termination of the respondents' parental rights is in the best interests of this child. Joshua is entitled to and deserves the security and permanency available to him through adoption by the petitioners.
Therefore, it is ordered that the respondents' parental rights be and are hereby terminated in order for the petitioners to file an application with the New Fairfield Probate Court as soon as possible for the adoption of Joshua.
PETRONI, J.